## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **DONELL J. BLOUNT, SR.,** | ) | |
| **Plaintiff,** | ) | **CASE NO. 7:11CV00091** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **LT. DELMER TATE, ET AL.,** | ) | **By: Robert S. Ballou** |
| **Defendants.** | ) | **United States Magistrate Judge** |

## REPORT AND RECOMMENDATION

Donell J. Blount, Sr., a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging among other claims that, on two separate occasions, the defendants, Virginia Department of Corrections ("VDOC") prison officials, used excessive force against him, or failed to protect him, in violation of the Eighth Amendment. By opinion and order entered March 26, 2012, the court took defendants' motion seeking summary judgment as to these claims under advisement and referred the matter to me for further proceedings and for preparation of proposed findings of fact and a recommended disposition of the case, pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I **FIND** that no genuine issues of material fact remain in dispute on which Blount could prove that the defendants' actions at issue violated his constitutional rights, and therefore, I **RECOMMEND** that defendants' motion be **GRANTED** as to both of Blount's remaining claims.

## I. BACKGROUND

### A. Procedural History

Blount's § 1983 complaint raised six claims, alleging that various prison officials at Red Onion State Prison violated Blount's free exercise rights under the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. §§ 2000cc, et seq., and his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to harsh living conditions and using excessive force against him. He later amended the complaint to add additional defendants to the excessive force claims. (ECF No. 34.) Defendants filed two motions for partial summary judgment, and after engaging in discovery, Blount responded to both motions.

The court's March 26, 2012 memorandum opinion and order granted summary judgment on the ground of qualified immunity as to Blount's first four claims. Two claims remain at issue:

> 5. On December 12, 2009, W. Davis, R. Boyd, B. Large, D. Lynch, Sgt. J. White used excessive force against Blount while placing him in ambulatory restraints after Blount threw an "inappropriate substance" at officers, and Lt. Delmer Tate and B. Milgrim, as camcorder operator,[1] failed to intervene; and

> 6. On June 8, 2010, Sgt. W. Wright, W. Davis, Cpt. S. Mullins, and Sgt. P. Payne, and used excessive force to remove the ambulatory restraints, and Investigator Tony Adams and camcorder operator Lt. T. McCoy failed to intervene.

As relief, Blount seeks "$25,000; punitive/compensatory damages; nominal damages" for each claim, plus costs. (ECF No. 1, p. 7.)

### B. Expansion of the Record

In the memorandum opinion referring the excessive force claims to me, the court stated:

> The magistrate judge may determine that limited expansion of the record is required to decide the motion. During discovery, the parties discussed video footage of the incidents at issue, but none of that video footage is currently before the court. Moreover, defendants have not provided any specific information about the inmate control techniques that Blount challenges in these claims.

(ECF No. 81, p. 14.) Thereafter, I ordered the defendants to submit additional materials in response to the court's concerns: (a) copies of any available video or surveillance camera footage related to Blount's placement in and release from ambulatory restraints on December 12-

---

[1] In the complaint, Blount identified this defendant as Officer Milgrum.

13, 2009, and plaintiff's removal from ambulatory restraints on June 8, 2010; (b) general information about Red Onion's use of video footage and, in particular, about the fate of video footage of the June 8, 2010 incident with Blount, which defendants have reported to be unavailable; and (c) policies related to the physical control techniques the defendants used against Blount during the incidents at issue. (ECF No. 84) I also directed Blount to submit his written declaration concerning what information related to plaintiff's § 1983 claims, if any, the video and surveillance footage provides, or would have provided if available, and Blount did so. (ECF No. 87-1.) Defendants submitted, *in camera*, several written policies and training materials responsive to the court's order ("security policies") and DVDs of the available video footage.

### 1. Blount's Motion for Production

Blount then moved for production of these security policies and for production of video footage of alleged excessive force incidents involving Inmates Tucker, Land, and Canada. (ECF No. 87.) Blount argues that he should be allowed to authenticate the defendants' security policy submissions before the court can consider them in summary judgment proceedings. After review of the record, I conclude that neither the written security policies nor the additional footage Blount requests is appropriate evidence to be considered in this case.

Defendants object to allowing Blount to view the security policies. They submitted these policies only in response to the court's order and only for *in camera* review, due to the sensitive nature of the policies and procedures. Defendants state: "This material deals with the very core of security in the prison, when and how to use force in the control of prisoners and therefore is not permitted by the Department of Corrections to be possessed or reviewed by the very prisoners who are subject to their control." (ECF No. 90, p. 1.) Defendants also assert that the

security policies are not material to the issues in the case and that they do not intend to rely on these security policies in moving for summary judgment. They argue that all the information necessary to find that defendants complied with the constitutional standards regarding excessive force is available in the affidavits and video footage now in the record.

Defendants' arguments are well taken. Blount does not sue any VDOC policy maker, and defendants do not rely on written security policies as a defense for the officers' actions on either December 12, 2009, or June 8, 2010. To prevail on the Eighth Amendment claims, Blount must prove that each defendant applied force in a manner that constituted "the unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312 (1986), abrogated on other grounds by Wilkins v. Gaddy, 130 S. Ct. 1175 (2010). That determination rests on case-specific inquiry: whether that force was justified under the particular circumstances involving the particular prisoner as perceived by the defendant officials. Hudson v. McMillian, 503 U.S. 1, 8 (1993). This subjective inquiry renders the security policies irrelevant to the issues in this case and I will not consider the security policies in my decision. Therefore, I sustain defendants' objections to producing these policies to Blount. By separate order, I will deny Blount's motion for production and direct the clerk to retain these policies, under seal, for return to the defendants, upon their request, after completion of the case and any subsequent appeal.

Defendants object to production of video footage of inmates Tucker, Land, and Canada as inadmissible and immaterial to the determination of Blount's claims. Blount asserts these video recordings will bolster his argument that Defendants Davis and Wright have a "habit" or history of using false accusations of resistance and finger bending or shoving restrained inmates as justification for further physical violence against them. See Federal Rule of Evidence 406

4

(providing that evidence of the habit of a person is relevant to prove conduct of person on particular occasion was in conformity with habit).

Blount's "habit" argument has no merit. Blount fails to show that any court has ruled the officers' actions reflected in this footage of other inmates to constitute excessive force under the Eighth Amendment standard that Blount must meet. Habit evidence requires a showing of a systematic pattern of conduct to be admissible under Rule 406. See Wilson v. Volkswagen of America, 561 F.2d 494, 511 (4th Cir. 1977).

> It is only when the examples offered to establish such pattern of conduct or habit are numerous enough to base an inference of systematic conduct and to establish one's regular response to a repeated specific situation or . . . where they are sufficiently regular or the circumstances sufficiently similar to outweigh the danger, if any of prejudice and confusion, that they are admissible to establish pattern or habit.

Id. (omitting internal quotations). "Habit means a course of behavior of a person regularly repeated in like circumstances." Id. (citing A.L.I. Model Code of Evidence Rule 307). These three isolated incidents over three years' time are insufficient to support a reasonable inference of habit by the officers. Blount's proffered evidence simply does not show that Officers Davis and Wright regularly repeat the conduct Blount alleges. Therefore, I find no basis for admitting the requested "habit" evidence and, by separate order, deny his motion for production of the video footage of inmates Tucker, Canada, and Land (ECF No. 87).[2]

### 2. Missing Video Footage of the June 10, 2010 Incident

Spoliation is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Goodman v. Praxair Servs., Inc., 632 F. Supp. 2d 494, 505 (D. Md. 2009). When a court finds that a

---

[2] I also note that Blount had ample time to move for production of this footage during the lengthy discovery period already provided to him in this case and failed to do so. The court's order of reference did not reopen discovery for the parties.

party's conduct related to lost evidence constitutes spoliation, the court may instruct a jury that it may assume that the party failed to preserve the evidence because it was detrimental to the party's case. Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155-56 (4th Cir. 1995). A party seeking a spoliation sanction must show these elements:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

Goodman, 632 F. Supp. 2d at 509 (citing Thompson v. United States Dep't of Housing & Urban Dev., 219 F.R.D. 93, 101 (D. Md. 2003)). Although a showing of bad faith is not always necessary to prove spoliation, "[a]n adverse inference about a party's consciousness of the weakness of his case . . . cannot be drawn merely from his negligent loss or destruction of evidence." Vodusek, 71 F.3d at 156. There must be a showing that the party "knew the evidence was relevant to some issue at trial," intended to destroy that evidence, and undertook "willful conduct [that] resulted in its loss or destruction," or no adverse inference applies. Id.; Dent v. Slegelbaum, Civil Action No. DKC 08–0886, 2012 WL 718835, at *5 (D. Md. Mar. 5, 2012) (slip copy).

In response to the court's concern about the missing video, defendants offered the declarations of Major K. McCoy, Chief of Security at Red Onion; Investigator T. Adams; T. McCoy, L. Fleming, Assistant Warden of Operations, and S. Mullins. (ECF Nos. 67, 73, & 85.) The officers state that no written policy requires staff to videotape incidents with offenders, but Red Onion security staff sometimes uses a handheld [digital] camera to video incidents with offenders "to maintain a record of the incident" and "to refute false allegations made by

offenders against staff." (K. McCoy Decl. ¶2; Adams Decl.) Such digital video footage is downloaded from the camera to a designated computer near the Major's office, with the download noted in a video log book. (K. McCoy Decl. ¶2.) The prison maintains the digital video on this computer until the end of the year and then transfers it for storage on an external hard drive for another year. (Id. ¶3) If footage of an incident is needed for court, the investigator then burns that footage to a DVD for use by the court and starts a chain of custody on the DVD. (Adams Decl.)

Officer T. McCoy states that after videotaping the incident with Blount on June 8, 2012, he "turned the camcorder over to someone in the Major's office for the video to be downloaded."[3] (T. McCoy Suppl. Decl.) Fleming states that after an officer downloaded McCoy's video of the incident onto the computer and logged it as video #384-10 in the logbook, Fleming reviewed the footage on the computer, as indicated by his initials beside the log entry. (Fleming Decl. ¶2 & Encl. A.) Major McCoy states that at some later time, it was discovered that this video and a number of other videos were lost. (Id. ¶3.) Most of the missing videos were of offenders with surnames beginning with letters A, B, or C. (Id.) Since counsel in this case first requested the Blount video footage in June 2011, several security and administrative staff members have tried to locate this footage or determine what happened to it.[4] (Id. ¶4.) Staff members have reviewed hours of video footage of Blount that was maintained on the external hard drive, searching without success for the June 8, 2010 footage. (Id.) Adams, who was the institutional investigator at the time of the June 2010 incident, states that the June 8, 2010 video of Blount "was not burned to a DVD because it either did not download properly or it was

---

[3] S. Mullins states that either Lt. McCoy or Mullins downloaded the footage from the camcorder to the computer on June 8, 2010. (Mullins Decl..)

[4] Major McCoy also states that videos are now being burned to Blu-Ray Disks for permanent storage.

erroneously erased during the change over to the computer hard drive." (Adams Decl. ¶1.)

Adams states that he "did not have possession of the video in question [and was not] responsible

for the safe keeping of videos." (Id.) All of the affiants deny deleting the video or having any

specific knowledge about how it was lost.

In compliance with the court's order, defendants submitted copies of the following video

footage, on DVDs: the handheld video and the "Rapid Eye" surveillance camera footage for the

December 12, 2009 incident and the Rapid Eye footage of June 8, 2010 incident. (ECF No. 85.)

Officials provided Blount the opportunity to view all of this footage on both August 10, 2011

and October 12, 2011, but he refused both opportunities. (ECF No. 52-2, Adams Affid. ¶4-5.)

Blount did, however, submit a declaration stating what he believes each video shows or would

have shown related to his claims. (ECF No. 87-1.)

Blount seeks some unspecified sanction against defendants for the loss and spoliation of

the June 8, 2010 camcorder video footage. I cannot find from the evidence submitted that

defendants had the culpable state of mind necessary to show that spoliation occurred in this case.

Goodman, 632 F. Supp. 2d at 505. First, defendants preserved and have made available to

Blount the Rapid Eye video of the incident on June 8, 2010, and all the video footage related to

Blount's claim concerning the December 2009 incident. Defendants' preservation and disclosure

of this extensive video footage contradicts Blount's assertions that they feared a video record of

their actions would cause them to lose this lawsuit. Second, digital information can be destroyed

or hopelessly misplaced in a data base at the touch of a button, without warning or recourse, and

the prison's system for preserving footage included three transition points when a technician's

inadvertent error could have destroyed or misplaced the Blount footage. Third, Blount's June

2010 camcorder footage was not the only inmate's footage that was lost, which suggests that the

event causing that loss was not intended to harm Blount's case. I conclude that these facts do not support a reasonable inference that anyone willfully destroyed video #384-10 or did so with intent to destroy evidence related to the lawsuit. The evidence supports, at most, a finding that the loss of the footage resulted from some prison officials' negligent or inadvertent conduct, and such conduct does not warrant a spoliation sanction of any sort. Vodusek, 71 F.3d at 156.

### 3. Available Video Footage

I have viewed the available footage of the December 12, 2009 and June 8, 2010 incidents, and find it appropriate to consider this footage in addressing the parties' motions. First, although the defendants did not initially rely on the video footage in support of their motion, they now wish to do so, as is their right. Second, Blount has had two opportunities to view the footage. The fact that he chose not to avail himself of these opportunities does not prevent the defendants from relying on this evidence.

## II. THE EVIDENCE

The evidence offered on summary judgment consists of the following: Blount's complaint (ECF No. 1); Blount's statement asking the court to take judicial notice of uses of force against other prisoners by Officers Wright and Davis (ECF No. 12); Blount's motion to amend (ECF No. 34); Blount's declaration (ECF No. 42-1, pp. 5-6); affidavits in support of defendants' motion for partial summary judgment from: W. Davis, J. White, B. Milgrim, P. Payne, T. McCoy, W. Wright, D. Tate, S. Mullins, and V. Phipps (ECF No. 63); Blount's memorandum in response to defendants' motion (ECF No. 74) and attachments to the memorandum, including notarized "affidavits" by Blount ("Blount Affid.") (ECF No. 74-1) and inmates Michael Boone, Vernon Belcher (ECF No. 74-1), Damion Land, and Kelvin Canada

(ECF No. 74-2)[5]; the handheld video and Rapid Eye footage from December 12-13, 2009 and the Rapid Eye footage from June 8, 2010 (ECF No. 85); and Blount's declaration concerning how he believes the video supports, or would have supported, his version of events (ECF No. 87-1).

### A. Use of Force on December 12, 2009

The factual background related to Claim 5 is uncontested by the parties and corroborated by the video footage. On December 12, 2009, Officers Barrett and Phipps came to Blount's cell door and placed the tray slot box over the food tray slot in his door, as required to pass his evening meal tray through the slot.[6] Blount knocked the feeding box off the food tray slot in his cell door and threw an "inappropriate substance" at the officers. Officers White and Davis arrived at Blount's cell to replace Barrett and Phipps, who then reported to the medical unit. Blount then threw the inappropriate substance at White and Davis.[7] White administered a burst of OC pepper spray toward Blount in an effort to subdue him. Blount hid behind his mattress to avoid the spray, but Davis was able to secure the tray slot door successfully.

Because of his misbehavior and aggressive actions, officers decided to place Blount in ambulatory restraints. Blount describes being placed in ambulatory restraints as being "handcuffed to the front with a black-box over the cuff chain, ankles shackled and a chain extending between the hand cuffs and shackles." (Blount Affid. ¶3A.) Ambulatory restraints are

---

[5]  Of Blount's submissions, ECF Nos. 1, 12, and 42-1 are signed under penalty of perjury, while Blount's affidavit and the affidavits of Boone, Belcher, Canada, and Land (ECF No. 74-1 & 74-2) each states that the document was "[s]worn and subscribed to before" a notary public, but do not indicate that the affiants signed under penalty of perjury.

[6]  The tray slot box is a security measure "used to prevent inmates from assaulting officers through the tray slot." (Mullins Affid. ¶4.)

[7]  The defendants state that Blount squirted feces on them from some sort of bag. Blount states that the substance was not feces and describes it as a "foul" smelling "concoction" he made by mixing "magic shave and floor stripper." (ECF No. 74, p. 7.).

Case 7:11-cv-00091-GEC-RSB   Document 92   Filed 08/24/12   Page 10 of 33   Pageid#: 545

the first level of restraints officers use "to control assaultive, disruptive, or unmanageable inmates in situations where there is danger for them to injure themselves or others." (Mullins Affid. ¶6.) Ambulatory restraints "are not used as punishment [and] are removed when the inmate's disruptive behavior has subsided [and officers decide he] no longer poses a danger to himself or others." (Id.) Officers must get approval from the Regional Director to maintain an inmate in ambulatory restraints longer than 48 hours at a time. (Id.) To place an inmate in ambulatory restraints, the officers must first follow standard procedures to remove him from his cell in shackles with his hands cuffed behind his back.

With Tate as supervising officer, Blount complied with the procedures to remove him from his cell. The video shows Blount talking loudly, but also following Tate's direction to remove his cap, place his hands through the tray slot to be cuffed, and kneel to be shackled. Officers then escorted Blount to the vestibule, where he knelt, as dictated by procedure, to remove his clothing and regular restraints, and to apply the ambulatory restraints. The camcorder video shows Blount continuing to talk loudly during this process, but cooperating with the officers as they removed his pants, which took several minutes. The Rapid Eye footage shows as many as twelve officers in the vestibule as officers prepared to move Blount's hands from behind his back to his front to apply ambulatory restraints. Two officers were outfitted in Hazmat suits hunched on either side of Blount, each holding one of Blount's arms, a third officer stood behind Blount to unlock the handcuffs, and a fourth officer stood directly in front of Blount.

The parties' accounts agree that Boyd was positioned on Blount's left and Davis on the right as an officer released one of Blount's hands from its handcuff and began to move his hands toward the front of his body. Blount suddenly moved forward at this transition when neither

hand was restrained and struck Sgt. Lyall, who was standing in front of Blount. The officers immediately placed Blount face down on the floor and ultimately applied the ambulatory restraints while he remained on the floor. The video shows that once the officers place Blount in restraints, they check them to make sure they are not too tight. The officers then helped Blount to his feet, and placed him in a blanket-like smock which covered him from the neck to his knees. The video shows medical personnel assessing Blount's reported injuries. After the medical assessment, the officers escorted Blount to his cell where he remained in ambulatory restraints until released on December 14, 2009 at around 10:00 a.m. Lyall wrote a disciplinary charge asserting that Blount had struck him.

The parties sharply dispute the nature of Blount's sudden movement toward Lyall, his behavior after officers placed him on the floor, and the actions the officers took in the course of getting the ambulatory restraints applied while he was on the floor. Blount states that he was calm and in full compliance with orders when Davis and Boyd, one on either side of him, "bent his fingers and shoved [him] forwards toward Lyall." (ECF No. 74, p, 6; Compl. 6.) Blount denies that he pulled away from the officers, that he intentionally struck Lyall, or that he was "combative" at any time. (Compl. 6; Blount Affid. 1B-C.)

Blount states that once he was on the floor, the officers "choked [him], tried to squeeze [his] testicles, dug metal restraints into [his] ankles and feet, dug a finger in [his] left eye . . . and fingers into [his] nostrils pulling them upwards towards [his] forehead," and "bent [his fingers]

backwards until [he] thought they were broken"[8] (Compl. 6; Blount Affid. 1D); and Tate, as supervising officer, and Milgrim, as the video operator, failed to intervene to protect him (Compl. 6; Blount Affid. 1F; ECF No. 34). Blount alleges that while he was on the floor with officers piled on top of him, he could not tell which officer did what, although he knew Tate was the supervising officer. (Blount Affid. ¶1F.) Blount states that "[a]t no time was there any justification for this assault on [him]." (Compl. p. 6.) Blount claims that the video will corroborate his version of events.

Officer Davis states that as he, Boyd, White, and Lyall "were placing ambulatory restraints on Blount, he was able to jerk his arm away from me while I was bringing his hand from the back to the front of his body" and "Blount struck Sergeant Lyall in the stomach." (Davis Affid. ¶5.) Davis states that after the officers saw Blount strike Lyall, they placed him face down on the floor and used "pressure points and wrist locks" to bring Blount under control to apply ambulatory restraints. (Davis Affid. ¶5.) The officers state that Blount remained "combative" (Id.), that he "was aggressive and continued to resist staffs' attempts to control him" and that he ignored several orders from Tate "to stop resisting staff" (White Affid. ¶7). Because "Blount was so combative and resistant, the restraints were placed on him while he was lying on his side on the floor." (White Affid. ¶7.) The officers deny that they tried to harm Blount by

_____

[8] In his response to defendants' motion, Blount describes the officers' finger bending technique ("the FBT") as "bending [the]fingers back against the natural bend of the joints and knuckles," "suddenly, without warning, and with so much force you don't have time to ball your hands up," and "when–not if– you pull your hands back from the shocking pain[, the officers] apply more force until your fingers are at or near your wrist." (ECF No. 74, pp. 12-13) (emphasis in original) Blount states, "I know from experience that the FBT is frequently used at Red Onion . . . and not to subdue a struggling prisoner, but whenever a guard even speculates that a prisoner may be about to become disruptive; and "disruptive" can mean anything or nothing. The guards have absolute discretion to make the call." (ECF No. 74, p. 12.) Blount states that application of the FBT is "terrifying, painful and almost guaranteed to cause severe pain, swelling, deformity and damage" to the fingers. (Id. at 12.) He states: "It doesn't take much more than common sense to recognize that it's virtually impossible, to use such a technique on delicate joints like those of the fingers and not dislocate or break them." (Id.) (emphasis in original).

"using unnecessary force or taking any other action that might cause injury to an inmate." (See, e.g., Davis Affid. ¶8.) Defendants rely on the video in support of their version of events.

The Rapid Eye footage, which does not record continuous action, shows that Blount's left arm, and the officer holding that arm, moved suddenly toward Lyall, but the video does not show the exact moment when the movement started. The handheld video shows the officers on either side of Blount grasping his fingers as the handcuff is removed from his right wrist. During this process, Blount is talking normally and is not complaining of pain. Then, the arm of the officer standing behind Blount to remove the handcuffs momentarily blocks the camera's view of Blount's left hand and the officer holding that hand as movement toward Lyall on that side begins. At the same time, the video shows Blount pulling his right hand and arm upwards. Blount can be heard grunting loudly as he and the two officers fall to the floor and other officers move to assist.

After Blount and the two officers beside him fall to the floor, both the Rapid Eye footage and the handheld video show an ever-moving, shifting group of five or six officers on the floor around and over Blount, blocking the camera's view of Blount's body. The camera's view of the officers' hands is blocked by other officers' bodies. This group struggle goes on for several minutes. On the handheld video, Blount's shouts and grunts can be heard throughout this portion of the altercation, along with his claim that he is not resisting and cries of "please stop." Tate's voice can also be heard, repeatedly telling Blount to relax, calm down, and hold still. After some time, Blount's cries subside and he verbally agrees to cooperate. Tate tells the officers to hold Blount still, while Tate explains that Blount needs to cooperate with the officers as they place him in the restraints while he is on the ground. Blount agrees, and the officers complete the restraint process without any further incident..

Blount states that as a result of the December 12, 2009 encounter with the defendants, he suffered "deformity of his fingers, feet, and eye," "the fingers felt like they were broken, and swelled to twice their normal size, and lost feeling and mobility," and the vision in [his] left eye was blurred "for weeks." (Blount Affid. ¶5.) The medical personnel who assessed Blount's injuries in the vestibule on December 12, 2009 noted that he had sustained "superficial skin abrasions" on his left eye with swelling and redness. A superficial abrasion was noted on his right ankle, as well as a superficial abrasion without swelling on the left side of his neck. (Phipps Affid. ¶6) In the hours and days after the incident, nurses noted superficial abrasions to Blount's eye, hand, and neck, and a knot on his foot, and told Blount to elevate the foot and apply cold compresses to the other sites. The doctor ordered pain medication and X-rays. By the third day, nurses noted that Blount walked with a steady gait.

Six days after the incident, the doctor examined Blount for complaints about his hands and left eye. The doctor noted that Blount's foot injury had "resolved," that his fingers showed swelling, but that his range of motion was "functional and improving," and skin was intact. (Phipps Affid. ¶12.) The doctor also noted "contusions [to Blount's] hands and eyes with sclera hematoma left eye," but noted no vision loss or change, and prescribed two drops of natural tears daily. (Id.) At a follow up visit on December 26, the doctor noted that Blount still complained of some pain and blurred vision and referred Blount to the eye doctor for an eye examination, but told Blount that the hematoma could take 4 to 6 weeks to resolve.

Davis states that in his experience working with Blount over several years, "Blount is a very assaultive and dangerous offender who has injured staff at Red Onion." (Davis Affid. ¶8.) Davis denies assaulting or trying to harm Blount at any time. Milgrim states, "In my experience with Blount, he is very assaultive and unpredictable. Anytime he is escorted to the shower or

recreation, he is videotaped." (Milgrim Affid. ¶6.) Lt. Tate states: "Blount is a dangerous inmate who has been very assaultive and injurious to staff at Red Onion."[9] (Tate Affid. ¶7.) Blount does not contest these statements about his past assaultive behavior toward staff.

### B. Use of Force on June 8, 2010

Many of the relevant facts related to Claim 6 are also uncontested. During morning pill pass on June 6, 2010, Officer Large placed the tray slot box on Blount's door and opened the tray slot door so Blount could retrieve his medication from the box. Blount, with a towel wrapped around his arm, tried to block the tray slot door open, but Large was secured it on his second attempt. Later that day, Blount stopped up his toilet and flooded his cell. Officers strip searched and restrained Blount and escorted him to the shower, while a cleaning crew mopped his cell. Blount reached out from a hole in the bottom of the shower door and sprayed what appeared to be feces from a small plastic bag at the officer supervising the crew, striking one officer on one side from the waist to the knee. The administrative duty officer had Blount placed in ambulatory restraints.

At approximately 7:35 a.m. on June 8, 2010, Captain S. Mullins ordered Officer W. Davis, Sgt. P. Payne, and Sgt. W. Wright to dress in protective gear to release Blount from ambulatory restraints. Blount refused to cooperate with de-cuffing procedures, stating that he was afraid that Wright and Davis would assault him while he was in restraints, because Davis had previously assaulted him. Blount believes that Wright had a history of beating prisoners in restraints and that both guards had threatened to attack Blount. Mullins insisted that Blount be

---

[9] Tate mentions as an example of the danger Blount presents to prison staff an instance when Blount assaulted Tate in 2007 in a medical triage room, as Tate and another officer were uncuffing Blount's hands so the nurse could examine him. Blount jerked free when his hands were unrestrained, kicked Tate in the groin, and then punched him in the mouth and on the side of his forehead before officers got him under control. (Tate Affid. ¶6.) Blount does not deny striking Tate in this manner, but asserts that Tate "assaulted [Blount] first" when Tate "dug his fingers into the pressure points of [Blount's] wrist" after it was uncuffed. (Blount Affid. ¶6.)

released from restraints and ordered Wright and Davis to bring Blount out of the cell, with Lt. T.

McCoy recording events with a camcorder.  Under threat of force, still in ambulatory restraints,

Blount came out of the cell and sat in a wheel chair.  Blount said that he would attack someone if

the officers released him from the ambulatory restraints.  The officers wheeled Blount out of the

pod into the vestibule.[10]  The officers got Blount out of the wheelchair and put him on his

knees.[11]  Blount kept his hands closed in fists, and Davis tried pushing his fingers between

Blount's closed fingers.  Davis yelled that Blount was bending his fingers.  Sgt. Wright yelled

that Blount had tried to bite him.

At this point, the parties' accounts diverge.  Blount denies bending anyone's fingers or

biting anyone and states that at this point, he kept his hands balled into fists (Blount Decl. 42-1

¶21), that he "never physically resisted [or was] assaultive" (Compl. p. 6.), and that he was "none

[sic] resistant"  (Blount Affid. ¶3D.)  Blount accuses Davis of "digging his fingers into . . .

pressure points of  [Blount's] neck as someone bent [his] fingers back until [he] felt they were

broken.  . . . [Blount] felt like [he] was choking [and] there was extreme pain in his neck."

(Blount Affid. ¶3D.)  Blount states that Investigator Sgt. Tony Adams and Cpt. Mullins did not

stop the other officers from "assaulting" Blount.

The officers state that as Davis "attempted to remove the lock from the [ambulatory]

restraints, Blount tried to bite Davis' hand."  (Payne Affid. ¶4.)  Officers then took Blount to the

floor to regain control of him and to safeguard staff.  Davis reports that he used "pressure points"

---

[10]  Officers can remove ambulatory restraints in the offender's cell, but "with combative and
assaultive inmates, the restraints are usually removed in the vestibule area [to] prevent[ ] the incitement of
other inmates in the housing unit, if the restrained inmate becomes loud and combative" during the
removal procedure.  There is also a camera in the vestibule to record the incident."  (Mullins Affid. ¶7.)

[11]  In his complaint, Blount does not mention how he got out of the wheel chair (Compl. 6), but in
his affidavit, he states that the officers "forced [him] out [of] the chair and put [him] on his knees"
(Blount Affid. 3B).

to regain control of Blount's head until Blount complied and stopped being assaultive. (Davis Affid. ¶7.) McCoy, who was videotaping, reports that he "did not see Payne, Wright or Davis choke [Blount], bend his fingers back or make any attempt to intentionally harm Blount." (McCoy Affid. ¶6.) The officers state that the force used against Blount was no more than necessary to regain control and maintain his safety and the safety of the officers involved. Officers returned Blount to his cell, still in ambulatory restraints, and the regional director authorized continuation of the restraints for another 24 hours. Blount remained in restraints until his release on June 9, 2010 without incident.

The Rapid Eye video of this incident shows the officers lifting Blount from the wheel chair and placing him on his knees at approximately 7:41:37 a.m. Two officers in Hazmat suits stood hunched beside Blount and a third stood in front of him. The officer to Blount's left blocks the Rapid Eye's view of Blount, but the video shows that the officers and Blount lurch sideways to the floor at approximately 7:41:51 a.m. For about thirty-six seconds, the officers hunch or kneel over Blount on the floor, reaching toward him, with their bodies blocking the camera's view of Blount and of their hands. At approximately 7:42:27, the officers appear to lift Blount back to a kneeling position and a minute later, place him back into the wheelchair, still in ambulatory restraints.

Blount asserts that after the June 8, 2010 incident, his fingers became "very swollen, immobile," and that he had extreme pain for days." (Blount Affid. ¶3D.) Nurses noted on June 8 that Blount complained of an injury to his right hand, that the area was red and slightly swollen with good circulation and skin intact, and that Blount refused to attempt range of motion exercises. Blount received Tylenol and X-rays of his right hand and wrist. X-ray results were normal with no fractures seen. When officers released Blount from restraints on June 9, the

nurse noted a superficial scrape on his right wrist and applied a band aid, but noted no other

injuries or complaints from Blount.

## III. APPLICABLE LAW

### A. Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The movant must

present the basis for its motion and identify those portions of the record, together with affidavits,

that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at

323.  If the movant meets its initial responsibility, the burden then shifts to the nonmovant to

demonstrate the existence of a factual dispute, that the fact in contention is material (a fact that

might affect the outcome of the suit under the governing law), and that the dispute is genuine

(the evidence is such that a reasonable jury could return a verdict for the nonmovant).  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

At summary judgment, the court's function is not to weigh the evidence and determine

the truth but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.

Although the court must view genuinely disputed facts in the light most favorable to the

nonmovant, the court "need not accept the legal conclusions drawn from the facts" and "need not

accept as true unwarranted inferences, unreasonable conclusions, or arguments."  Kloth v.

Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006) (omitting quotation).  "When opposing

parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007) (omitting

internal quotations, alterations, and citations).  To defeat a supported motion for summary judgment, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. (omitting quotation). In particular, where the record contains an unchallenged videotape capturing the events in question, the court must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.  Id.; Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008).

### B.  Excessive Force

The Eighth Amendment does not prohibit all application of force or infliction of pain against prisoners.  United States. v. Gore, 592 F.3d 489, 494 (4th Cir. 2010).  "[O]nly the unnecessary and wanton infliction of pain" rises to the level of a constitutional violation. Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, ___ U.S. ___, 130 S. Ct. 1175 (2010).  When an inmate claims officers used excessive force against him, the court asks two questions:  whether a specific prison official "acted with a sufficiently culpable state of mind and [whether] the alleged wrongdoing was objectively harmful enough to establish a constitutional violation."  Hudson, 503 U.S. at 8 (omitting internal quotations).

In applying the subjective component under Hudson, the court asks whether officials applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm"  Id. at 7 (quoting Whitley, 475 U.S. at 320-21.  The court must "focus on whether the evidence supports the inference that the guards wantonly punished" the inmate, and not on whether their actions were "necessary" in the court's eyes.  Whitley, 475 U.S. at 319, 322.  In Whitley, the Supreme Court recognized that relevant

20

factors to consider in this inquiry are: (1) the need for application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury, (4) the threat reasonably perceived by the responsible officials based on the facts known to them, and (5) any efforts made to temper the severity of a forceful response. Id. at 321. "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Id.

"In recognition that the prison environment is a dangerous one for correctional officers, prison administrators must be accorded "wide-ranging deference" to design and implement policies and practices that in their judgment are necessary for the preservation of order and security." Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998) (quoting Whitley, 475 U.S. at 321-22). Likewise, courts "must accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; [to do] otherwise [would be to] give 'encouragement to insubordination in an environment which is already volatile enough.'" Scarbro v. New Hanover County, 374 F. App'x 366, 370 (4th Cir. 2010) (quoting Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999)).

In addressing the less demanding, objective component under Hudson, the court asks whether the force applied was "nontrivial." Wilkins, 130 S. Ct. at 1779. The objective inquiry is "responsive to contemporary standards of decency," and in the excessive force context, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . . whether or not significant injury is evident." Hudson, 503 U.S. at 9. Nevertheless, the extent of the inmate's injury is not "irrelevant" to the Eighth Amendment inquiries, as it "may suggest 'whether the use of force could plausibly have been thought

necessary' in a particular situation" or may "provide some indication of the amount of force applied." Wilkins, 130 S. Ct. at 1778 (quoting Hudson, 503 U.S. at 7). As a result, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim ." Wilkins, 130 S.Ct. at 1178 (quoting Hudson, 503 U.S. at 9).

### C. Failure to Protect or Intervene

To establish a constitutional claim that a prison official failed to protect him, the inmate must show: (1) that the omission resulted in "serious or significant physical or emotional injury," and (2) that prison officials exhibited deliberate indifference to inmate health or safety. De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks omitted). To be deliberately indifferent, a prison official must "know of and disregard an objectively serious . . . risk of harm." Id. Mere negligence does not qualify as deliberate indifference. Davidson v. Cannon, 474 U.S. 344, 347 (1986); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

If an inmate shows that "a bystanding officer (1) [was] confronted with a fellow officer's illegal act, (2) possesse[d] the power to prevent it, and (3) cho[se] not to act, that officer may be deemed an accomplice and treated accordingly. Randall v. Prince George's County, 302 F.3d 188, 203 (4th Cir. 2002) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) (observing that officer who stands by and does not seek to assist victim could be "tacit collaborator"). To show that a supervising officer failed to fulfill his duty to protect plaintiff by ensuring that his subordinates act within the law, plaintiff must show that the subordinates were "engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury" to

which the supervisor responded unreasonably.  <u>Shaw v. Straud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (omitting internal quotations).

## IV.  CONCLUSIONS OF LAW

### Claim 5:  Use of Force during Application of Ambulatory Restraints

Blount claims that Boyd and Davis intentionally pushed Blount toward Lyall as they attempted to place him in ambulatory restraints on December 12, 2009 to simulate aggressive or resistant behavior and that the officers' use of physical force was disproportionate to his compliant and noncombative behavior in the vestibule, and that Tate, as supervising officer, and Milgrim, as the video operator, failed to intervene to protect him.   Blount does not challenge the other forms of force used against him that day, including OC gas, handcuffs, shackles, physical escort, and later, the ambulatory restraints themselves.

Defendants do not contend that Blount's injuries from the December 12, 2009 incident were so minimal as to support a finding that the officers used only trivial force against him.  <u>See</u> <u>Wilkins</u>, 130 S. Ct. at 1779.  Blount claims to have suffered intense pain when the officers bent his fingers, used pressure points, poked him in the eye, and dug the leg restraints into his ankle. The undisputed evidence indicates that Blount sustained injuries from this incident, including swollen fingers, a hematoma in his left eye, superficial abrasions near his eye and on his hand and neck, and a knot on his foot that affected his ability to walk for a day or two.  Most of the injuries resolved within a few days, but Blount's fingers remained swollen for at least a week and the eye hematoma did not subside for several weeks.  The documented injuries and Blount's alleged pain, both immediate and in the weeks that followed, suggest that the force used against him by one or more of the defendants was more than trivial.

Case 7:11-cv-00091-GEC-RSB   Document 92   Filed 08/24/12   Page 23 of 33   Pageid#: 558

The subjective inquiry under Whitley as to the threat reasonably perceived by the officers requires the court to look beyond Blount's compliance with officers' orders as they cuffed him, escorted him from his cell to the vestibule, and asked him to remain kneeling on the floor to place him in ambulatory restraints. Red Onion is a high security prison, and Blount has repeatedly and unpredictably assaulted staff. Blount's admitted assault on Tate in 2007 occurred under similar circumstances, while officers had momentarily uncuffed Blount's hands to move the the restraints from back to front. (Tate Affid. ¶6.) On December 12, 2009, Blount knocked the tray box off his door and threw foul and potentially harmful substances on four officers. A reasonable officer would perceive from Blount's continuum of disruptive, violent behavior that Blount presented a potential threat to the officers. Thus, handling Blount outside of his cell and unrestrained required the officers to use the utmost caution when Blount's hands were uncuffed to apply the ambulatory restraints and to use force where necessary to prevent him from breaking free or assaulting anyone. Boyd and Davis directed preventative force to Blount's hands as the primary source of potential threat during the uncuffing procedure. The video shows them grasping and holding Blount's fingers out and away from his body to keep Blount's hands under control as the officer removed the right cuff to move the restraints to the front. This hold on Blount's fingers also placed the officers in the ready to apply force instantly at the first signal of misbehavior by Blount.

Blount's hands were unrestrained when he suddenly moved forward and hit Lyall. Blount presented a threat to the officers at that moment, and the officers no longer had complete control of Blount. No genuine dispute exists that these events required a decisive, forceful response to restore order, regardless of whether Blount moved forward and struck Lyall of his own volition or if Boyd and Davis pushed him forward, as Blount alleges.

The officers made split-second decisions to take Blount to the floor to regain control of the situation. The videotape establishes that Blount remained uncooperative with the officers who responded to this ongoing threat by using "pressure points and wrist locks to maintain control of Blount." (Davis Affid. ¶5.) The officers reasonable perceived a threat which required the use of force. The officers acted to regain control over Blount and not in a wanton effort to harm him.

Blount's claims that he was not "combative," that "[t]he officers used the oft used technique of telling [him] to stop resisting to look good for the camera," and that "this brutal attack on [him] was without provocation and/or justification," (ECF No. 74, p. 7.), do not, create a triable fact issue. Blount did not immediately become calm after falling to the floor. The video footage does not support a reasonable inference that Blount no longer presented a security threat. Iko, 535 F.3d at 230. In fact, the video shows the officers on top of and around Blount repeatedly shifting to get a hold on each leg and arm and to keep Blount still to place him in restraints. Once Blount agrees to hold still and does so, the officers hold still, too. Until this point, Blount's continued movements, whether "combative" or simply reactive or uncooperative, supported the officers' perceptions that he posed an ongoing threat and a need for force sufficient to regain and maintain control and restore discipline. Moreover, whatever triggered Blount's movement toward Lyall, that unexpected lunge, leaving Blount's hands uncuffed, justified the officers' belief that the situation required the use of force to control Blount until the officers had safely applied the ambulatory restraints.

The second and third Whitley factors favor defendants' position. The contact with Blount and the location of his injuries indicate, in keeping with the second Whitley factor, that the officers directed their force primarily to that the area where Blount posed the most risk

25

during the alteration on the floor: his uncuffed hands, his shackled feet, and his head. With Blount face down and hands uncuffed, pulling back on his fingers was consistent with a focused effort to control Blount's hands and bring them out from under his body. Putting pressure on his neck, pulling at his nostrils, and even contacting his eye in a way that caused only a temporary hematoma–these actions indicate a minimal, localized application of force to control Blount's head and prevent head butting, spitting or biting. In grabbing and holding onto Blount's feet and ankles to control him, the officers may simultaneously have caused the shackles to dig painfully into Blount's flesh. Even "trying to squeeze [Blount's] testicles" is not inconsistent with a good faith effort to use minor, temporary discomfort to require Blount to hold still and to comply with officers' orders. In response to the risks a dangerous inmate like Blount posed with his hands uncuffed, if some of these efforts caused discomfort and even temporary pain, that fact alone is not sufficient to prove that the pain was wantonly or maliciously inflicted. See Gore, 592 F.3d at 494 (finding Eighth Amendment does not prohibit all infliction of pain against prisoners); Stanley, 134 F.3d at 634 ("the court cannot always expect a perfectly measured response" to a dangerous prison disturbance).

Moreover, the injuries Blount complained of to medical staff after the incident were not serious and required little treatment. Blount had no broken bones, no deep cuts, and no long-term injury to his nose or eye. The swelling in Blount's fingers and the bruise to his eye resolved within a few weeks and required only pain medication. The abrasions on other parts of his body were healing within days and did not require any stitches. The injury to his foot resolved within days. No reasonable fact finder could conclude, given the minor extent of Blount's injuries that defendants used control tactics which were disproportionate to the need for force or that they used these tactics wantonly to cause harm. See, e.g., Glover v. Young, No. 3:10–cv–523–RJC,

2012 WL 868890, *6 (W.D. N.C. Mar. 13, 2012) (finding no material dispute over whether defendant kicked and punched detainee plaintiff in taking him to the ground, based on undisputed evidence plaintiff was not injured).

Although some of defendants' physical control tactics certainly had potential to cause serious injury, such as broken fingers or serious eye injuries, Blount's minor, short-lived, injuries prove that the officers tempered the force to avoid any such consequence, in keeping with the fifth Whitley factor. The officers' cessation of force, once they applied the ambulatory restraints, shows that the defendants utilized the challenged control mechanisms only to the extent necessary to restore order.

Finally, Blount's evidence fails to present a triable issue of fact as to whether Boyd or Davis intentionally pushed an otherwise completely compliant Blount, for the purpose of justifying retaliatory force in response. In general, claims of retaliation by inmates are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996). In the case of a dangerous inmate like Blount, officers may reasonably be called upon to react to the slightest indication of coming misconduct and move to prevent it even before it starts. Although factual conflicts exist as to whether the officers pushed Blount towards Lyall or he intentionally moved in that direction while unrestrained, a mere shove or push is not a

wanton use of force in violation of the Eighth Amendment.[12]  An unrestrained Blount presented a danger to the officers in the vestibule justifying the force used to subdue him.

Under all factors of <u>Whitley</u>, 475 U.S. at 320-21, no reasonable fact finder could conclude that on December 12, 2009, the officers wantonly applied force with an intent to punish Blount, as required to prove the subjective facet of his Eighth Amendment claim under <u>Hudson</u>.[13]  503 U.S. at 8.  Rather, the evidence supports a finding that these officers, in good faith, applied the type and amount of force they believed was necessary, given Blount's prior behavior and movements, to effectively restore order and apply the ambulatory restraints to Blount.

Based on the conclusions concerning Blount's excessive force claims, he also fails to present any genuine issue of material fact on which he could prove that Defendants Tate or Milgrim failed to protect him.  Tate cannot be liable for responding unreasonably to the potential for, or the actuality of, his subordinates committing a constitutional injury against Blount, when

---

[12]  Blount attempts to bolster his claim with accounts from inmates Canada and Tucker, both claiming that Officer Davis pushed them under similar circumstances to simulate aggressive behavior warranting use of force.  (Blount Affid. ¶2A & 2B & Attach. C.)  These incidents, which occurred months or years after Blount's encounter with Davis in December 2009, involved officers placing Canada and Tucker in ambulatory restraints after charging them with throwing foul substances at staff.  As in Blount's account of his experience, the only evidence that the officer's movement was intentional is each inmate's self-serving characterization.  Moreover, these accounts of other isolated events are not sufficient to support a reasonable inference of systematic conduct by Boyd or Davis, as required for admission of habit evidence under Rule 406.  <u>Wilson</u>, 561 F.2d at 511.

[13]  Blount's complaint as amended by ECF No. 34 identifies Davis as one officer who pushed him and his later affidavits identify Boyd as the second such officer, point to Tate as the supervising officer, and to Milgrim as the video operator who failed to intervene.  Liberally construed, the complaint as amended alleges that Lyall, Large, and Lynch were the other officers dressed in riot gear (so he could not identify them) who took part in subduing him on the floor.  The complaint alleges that Sgt. White "was there."  Defendants argue that Defendants Large, Lynch, and White are entitled to summary judgment on the ground that Blount's complaint as amended does not allege specifically what role each of these officers played or how each of them violated his constitutional rights.  Because I find that Blount fails to present any genuine issue of fact in dispute as to all of the defendants' actions as a group, I have not separately addressed whether any of these defendants is also entitled to summary judgment on an individual basis.

28

no such injury occurred.  <u>Shaw</u>, 13 F.3d 791, 799 (4th Cir. 1994) (omitting internal quotations).

Even if the court were to conclude that one or more of the officers Tate supervised used

excessive force against Blount, the evidence fails to show Tate had notice that any of his officers

presented a specific risk of such harm toward Blount, either before or during the altercation in

the vestibule.  <u>See</u> <u>Shaw</u>, 13 F.3d at 799.

       Similarly, Blount has no triable issue as to whether  Defendant Milgrim, standing by as

the video operator, responded unreasonably to another officer's commission of a constitutional

violation against Blount, when no such violation occurred.   Moreover, the evidence does not

support a finding that Milgrim "possesse[d] the power to prevent" the participant officers from

inflicting the alleged constitutional injuries, as required to impose bystander liability on these

defendants under § 1983.  <u>Randall</u>, 302 F.3d at 203.

### Claim 6:  Use of Force in Attempted Removal of Ambulatory Restraints

       Blount asserts an excessive force claim for the  June 8, 2010 incident based on his refusal

to be removed from ambulatory restraints.  Blount fails to present admissible evidence from

which a reasonable fact finder could conclude under the subjective facet of <u>Hudson</u> that the

defendant officers wantonly applied force to harm him on June 8, 2010.  Blount's account of the

events in June 2010 undermines any conclusion that the defendant guards wantonly acted to

injure him.   On June 6, 2010, Blount intentionally disrupted meal procedures, flooded his cell,

assaulted an officer with his "foul" mixture, and threatened to attack someone.  These animalistic

and threatening actions created the need for force, both the use of ambulatory restraints and the

inevitable physical contact officers had to use in applying and removing the restraints.  Blount

also created the need for heightened force on June 8, 2010 when he threatened to harm someone

if released from his restraints and then refused to cooperate with normal procedures for removal of the restraints.

Contrary to Blount's apparent belief, an inmate's personal fears do not excuse noncompliance.

> Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

Lewis v. Downey, 581 F.3d 467, 476 (7th Cir. 2009) (citation omitted); Jackson v. Allen, 376 F. Supp. 1393, 1395 (D. Ark. 1974) (noting that a right to refuse to submit to punishment could seriously undermine discipline in prisons).  Blount's intransigence on June 8, 2010, not any action by the officers, created the need to employ alternative control techniques to maintain safety and order.

Blount's continuing misconduct led the officers to perceive quite reasonably that Blount presented an ongoing threat of violence when unrestrained, even for a few seconds, during the transfer from ambulatory restraints to regular restraints.  At the start of that critical stage, Blount chose to ball up his hands to frustrate efforts to remove the hand restraints.  This action, which Blount self-servingly characterizes as "none [sic] resistant," called for intensified physical measures to remove the restraints.  The measured force the officers exercised to address Blount's noncompliance–taking Blount to the floor and applying physical holds to maintain control and remove the restraints–related directly to the need for force that Blount's actions created, in keeping with the second and fourth Whitley factors.

The injuries of which Blount complained to medical staff on June 8, 2010, did not involve any broken bones or require extensive medical care and resolved within a few days.

Blount's injuries from the June 8, 2010 incident were not inconsistent with the type and amount of force necessary to remove the restraints without Blount's cooperation, which he had no right to resist. The minor nature of his injuries also indicate that the officers tempered the force, looking to the fifth Whitley factor, so as not to cause long-term or crippling injuries. More importantly, these injuries do not support a reasonable inference that the officers acted wantonly or intended to punish Blount. Whitley, 475 U.S. at 319.

Under all factors of Whitley, 475 U.S. at 320-21, there is no genuine issue of material fact in dispute on which Blount could support a reasonable inference that Wright, Davis, or Payne wantonly applied force with an intent to punish Blount on June 8, 2010, as required to prove the subjective facet of his Eighth Amendment claim under Hudson. 503 U.S. at 8. Rather, the evidence supports a reasonable inference that the officers applied the force they believed was necessary to restore order, given Blount's uncooperative behavior. The defendants are thus entitled to summary judgment on Claim 6 without further discussion of the objective facet under Hudson.[14]

Based on the conclusions concerning the excessive force claims, Blount also fails to present any genuine issue of material fact on which he could prove that Defendants Mullins, Adams, or McCoy failed to protect him. Mullins and Adams cannot be liable for responding unreasonably to the potential for, or the actuality of, his subordinates committing a constitutional injury against Blount, when no such injury occurred. Shaw, 13 F.3d 791, 799 (4th Cir. 1994) (omitting internal quotations). Even if the court concluded that one or more of the officers Mullins supervised used excessive force against Blount, the evidence fails to show Mullins had notice that any of his officers presented a specific risk of such harm toward Blount, either before

---

[14] Because the court concludes that the defendants are entitled to summary judgment on the merits of Blount's excessive force claims, the court will not address their additional defense of qualified immunity.

or during the altercation in the vestibule.  See Shaw, 13 F.3d at 799.  Blount's verbal complaints that he was afraid of Wright and Davis did not require Mullins to "protect" Blount by continuing the ambulatory restraints based merely on Blount's fear.  Once Blount physically resisted the officers while removing the restraints, Mullins was justified in directing the officers to use some physical force to remove them, in accordance with the VDOC time limit for such restraints.

Similarly, Blount has no triable issue as to whether Defendant McCoy, as the bystander video operator, responded unreasonably to another officer's commission of a constitutional violation against Blount, when no such violation occurred.  Moreover, the evidence does not support a finding that McCoy "possesse[d] the power to prevent" the participant officers from inflicting the alleged constitutional injuries, as required to impose bystander liability on these defendants under § 1983.  Randall, 302 F.3d at 203.

Even taking the evidence in the light most favorable to Blount, however, for reasons herein discussed, no reasonable fact finder could conclude that the defendant officers wantonly applied force for the purpose of harming Blount on either December 12, 2009 or June 8, 2010 , rather than using force in a good-faith effort to maintain and restore order.  Thus, Blount's claim fails and I **RECOMMEND** granting defendants' motion for summary judgment as to Claims 5 and 6.

## V.  RECOMMENDED DISPOSITION

Based on the stated findings and for the stated reasons, I **CONCLUDE** that defendants' motion for summary judgment should be granted as to Claims 5 and 6 for excessive force and failure to protect.

The Clerk of the Court is **DIRECTED** immediately to **TRANSMIT** the record in this case to the Honorable Glen E. Conrad, United States District Judge.  Both sides are reminded

that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached herein may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court is hereby directed to send copies of this Report and Recommendation to plaintiff and counsel of record for defendants.

Entered: August 24, 2012

*/s/ Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge