CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 12 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DONELL J. BLOUNT, SR.,     )
                                   )    Civil Action No. 7:11CV00091
      Plaintiff,            )
                                     )    **MEMORANDUM OPINION, FINDINGS**
                                     )    **OF FACT, AND**
                                     )    **CONCLUSIONS OF LAW**
v.                                      )
                                     )    By: Hon. Glen E. Conrad
W. DAVIS, et al.,          )    Chief United States District Judge
                                     )
      Defendants.        )

This case, presently before the court following a one day bench trial, stems from an incident at the Red Onion State Prison ("Red Onion") that occurred on December 12, 2009. The plaintiff, Donell J. Blount, Sr., a Virginia inmate proceeding pro se, claims that the defendants used excessive force against him in violation of the Eighth Amendment to the United States Constitution. Finding that the plaintiff has failed to prove his case by a preponderance of the evidence, the court will rule in favor of the defendants.

I.     **Procedural Background**

Blount is incarcerated at Red Onion in Pound, Virginia. Blount filed his original complaint in this matter on February 25, 2011, alleging violations of his rights under the First and Eighth Amendments to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act. 42 U.S.C. § 2000cc, et seq. On March 26, 2012, the court granted the defendants' motion for summary judgment as to the plaintiff's first four counts, and referred the remaining two counts to a United States Magistrate Judge for appropriate proceedings, pursuant to 28 U.S.C. § 636(b)(1)(B). The remaining two counts dealt with accusations that certain correctional officers at Red Onion used excessive force against Blount during incidents

that occurred on December 12, 2009 and June 8, 2010. Upon review of the evidence, the magistrate judge found that "no genuine issues of material fact remain in dispute on which Blount could prove that the defendants' actions at issue violated his constitutional rights." (Report and Recommendation at 1.) Accordingly, the magistrate judge recommended that the court grant the defendants' motion for summary judgment as to both of Blount's remaining claims. After considering Blount's objections to the magistrate judge's report, the court adopted the magistrate's recommendation that summary judgment be granted as to the June 8, 2010 claim, but declined to enter judgment as to the December 12, 2009 incident. Regarding that claim, the court found that Blount had presented a factual question as to whether the defendants pushed him into another guard in an attempt to manufacture the use of force against him. The court found that the video footage of the scene[1] was inconclusive as to the cause of contact, and the court held that, taking Blount's sworn statements as true, "a reasonable fact finder could conclude that Davis and Boyd acted with malicious and sadistic intent, and that their actions were not part of a good faith effort to maintain discipline." (Memorandum Opinion at 8-9.) Blount waived his right to a jury trial, and on May 16, 2013, a bench trial was held on Blount's sole remaining claim.

## II.    Summary of the Evidence

### A.    The December 12, 2009 Incident

#### i.    Video evidence

The video footage of the incident, played numerous times at trial, provides an uncontroverted record of much of what happened immediately before and after the alleged assault, and is helpful in providing context to the witness testimony. The handheld video begins

---

[1] The magistrate judge, in his report and recommendation, had expanded the record to include footage from two videos of the incident, one from a handheld camera operated by a correctional officer, and the second from the "Rapid Eye" surveillance camera installed in the room where the incident occurred.

with the aftermath of an incident in which Blount, while being served his evening meal, dislodged the feeding box from the food tray slot on his cell door and threw an "inappropriate substance" at a number of correctional officers present at the scene.[2] In response to this behavior, the officers begin the process of placing Blount in ambulatory restraints. Although initially resistant, Blount eventually complies with the officers' requests to place his hands through the tray slot so he can be handcuffed and brought to another room where the restraints will be applied. Once in the other room, known as the vestibule, he is made to kneel on the ground and his clothes are removed. His handcuffs are removed, and the officers prepare to move his hands to the front of his body where they can be secured in the new restraints. Captain Delmar Tate, the supervising officer on the scene, is directing the staff and communicating with Blount throughout the procedure.[3] The video shows Blount talking very loudly and occasionally yelling, but generally being cooperative with the officers. The two defendants, outfitted in Hazmat suits, stand on either side of Blount, each holding one of his arms. The video shows Davis to be on Blount's left with Boyd to Blount's right.[4] At this point, a third officer is standing behind Blount preparing to unlock the handcuffs, and a fourth officer, Sergeant Lyall, stands directly in front of Blount ready to place his hands in the new restraints. Several other officers are in the vestibule watching the procedure. As the handcuffs are removed, Davis and Boyd begin to bring Blount's arms around to the front of his body. As this is happening, Blount's left arm suddenly moves forward, striking Sgt. Lyall. The view from the handheld camera is mostly obscured by the officers' bodies, and all that can be seen is a sudden movement

---

[2] Blount testified that the substance was a concoction of aftershave and floor stripper, while numerous officers testified that it was feces. The video clearly demonstrates that the substance contained fecal matter.
[3] Tate was a Lieutenant at the time of the incident but has since been promoted to Captain.
[4] In this court's summary judgment opinion, as well as the magistrate judge's report and recommendation, it was incorrectly stated that the parties agreed that Davis was holding Blount's right arm and Boyd was holding his left arm. The defendant noted this error at trial, and the video evidence confirms the defendant's current position.

and then a number of officers tackling Blount to the ground. The Rapid Eye camera, while offering a clearer view of the incident, only captures one frame per three seconds and does not show the exact moment when Blount's arm begins to move. Both videos show a struggle between Blount and a number of the officers as they attempt to regain control of Blount while he is on the floor. The struggle ensues for several minutes, and the videos show a shifting scrum with the officers covering Blount. The officers' hands are not visible in either of the videos. Tate is repeatedly heard telling Blount to stop resisting, and Blount is heard shouting "please stop." Blount's hands are eventually re-secured and he is placed in a wheelchair to be examined by a staff nurse.

### ii. Witness testimony

While the parties are in agreement on much of what took place immediately before and after the incident, their accounts differ sharply on what caused Blount's arm to move forward into Sgt. Lyall, and on the degree of force used to restrain Blount once he was on the floor. Blount testified that as the officers moved his arms from his back to his front, Davis jerked his left arm forward into Sgt. Lyall so as to purposefully initiate contact. Blount's explanation for the alleged act stems from his assertion that a "beat down" squad exists among some of the officers at Red Onion, including the defendants in this case. Blount alleged that these officers occasionally attempt to simulate contact between an inmate and an officer in order to create a false justification for the officers to tackle and beat prisoners. Blount testified that Davis intentionally pushed his arm into Lyall for just this reason, and that it succeeded in provoking the other officers into tackling and further injuring him. Blount also testified that once on the ground, he complied with the officers' requests and did not resist their attempts to re-secure his hands. He stated that in spite of this, the officers unnecessarily bent his fingers back, painfully

4

squeezed his legs, and gouged his left eye. Blount claimed that his fingers remained swollen for six weeks, and he suffered a hematoma in his eye that continued to bother him for two months.[5]

The defendants, in contrast, testified that Blount moved his left arm forward intentionally in an attempt to strike Sgt. Lyall. Officers Boyd and Davis, along with Captain Tate, testified that they all saw or felt Blount jerk his left arm forward into Lyall shortly after his hands were freed. Specifically, Boyd testified that he felt Blount tense his right side immediately before moving his left arm, which indicated to him that Blount was preparing to move. Davis testified that he felt Blount suddenly and forcefully jerk his arm forward, causing Davis to lose control of Blount's left hand. Davis adamantly denied pushing Blount's arm.

All of the officers testified that by striking Lyall and freeing his hands of their control, Blount created a dangerous situation to which they needed to respond aggressively. They further stated that Blount refused to cooperate once he was on the ground, tucking his arms under his body to keep from being handcuffed. The officers acknowledged using force as they attempted to regain control over Blount's hands, including by bending his fingers back. All of them, however, denied poking or gouging Blount's eye. They also each denied any knowledge of a "beat down" squad at Red Onion, or of ever personally simulating contact between an inmate and an officer in order to justify the use of force.

## B.    Kelvin Canada and Benjamin Tucker

In an attempt to bolster his case by proving a common plan or motive, Blount called to the stand two other Red Onion inmates claiming to have been pushed by Officer Davis under similar circumstances. The first, Kelvin Canada, testified regarding an incident that occurred on

---

[5] The Red Onion staff nurse who evaluated Blount after the incident also testified at trial regarding his injuries. Her testimony revealed that Blount suffered skin abrasions to his face, neck, and ankle; redness and swelling in his left eye; and soft tissue damage to his fingers and hand. X-rays taken of Blount's hands and fingers were negative, ruling out any fractures or bone damage.

September 3, 2011, while officers attempted to place him in ambulatory restraints in punishment for throwing feces at a correctional officer. A video of the incident shows two officers standing to Canada's sides, holding his arms as they move his uncuffed hands from the back to the front of his body. During the process, Canada's right arm, held by Davis, jerks forward into the officer standing in front of him. The officers immediately take Canada to the ground and attempt to regain control of his hands. Canada testified that Davis pushed his arm forward in an attempt to initiate contact with one of the officers. In contrast, Davis testified that Canada moved his arm forward intentionally in an attempt to strike the officer.

Another inmate witness, Benjamin Tucker, testified about a similar incident that occurred on April 3, 2010. The video from this incident, as with those involving Blount and Canada, shows the officers attempting to place Tucker in ambulatory restraints after he has thrown feces at a guard. During the process, with Davis to Tucker's side, Tucker's arm jerks forward into the officer in front of him, and he is tackled by the remaining guards in the room. However, the view of Tucker and Davis is largely obscured in the video. Tucker's testimony is not clear as to whether Davis or another officer pushed him forward, just that Davis was one of the two guards holding his arms during the incident and that he did nothing to provoke the officers' use of force. In his own testimony, Davis denied initiating any contact. Tucker also testified that while he was on the ground being restrained, his fingers were bent backwards and he was poked in the eye.

## III.    Applicable Law

Every inmate has the right under the Eighth Amendment to serve his term of imprisonment without enduring "cruel and unusual punishment" at the hands of prison officials. In the prison context, the amendment "protects inmates from inhuman treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth

Amendment does not, however, prohibit all applications of force that inflict pain or injury against prisoners. An officer always has the right, and the duty, to use such reasonable force as is necessary under the circumstances to maintain order.

To establish whether the defendants violated the Eighth Amendment, the court must analyze both subjective and objective components of the defendants' actions. Id. This analysis requires "inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component), and whether the deprivation or injury inflicted on the inmate was sufficiently serious (objective component)." Id.

When an inmate claims, as Blount does here, that prison officials used excessive force in violation of the Eighth Amendment, he must meet a heavy burden to satisfy the subjective component. See Whitley v. Albers, 475 U.S. 312, 320-21 (1986). The inmate must demonstrate that the prison officials applied force "maliciously and sadistically for the very purpose of causing harm," and not as part of "a good faith effort to maintain or restore discipline." Id. To do this, the inmate must show that the officials possessed a state of mind of "wantonness in the infliction of pain." Id. at 322. In determining whether a prison official has acted with wantonness, the court may consider such factors as: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the threat to safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; (4) the extent of the injury inflicted; and (5) any effort made to temper the severity of the force used. Id. at 321. These factors aid the court in inferring whether the use of force was necessary, or whether the force was intentionally aimed at inflicting physical harm. Id.

If an inmate has established the subjective requirement that force was applied maliciously and sadistically, the objective component is satisfied by a showing that the harm suffered was "nontrivial." Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010). This can be shown by examining the nature and extent of the plaintiff's injuries as an indication of the amount of force applied.

## IV.    Findings of Fact and Conclusions of Law

The court first notes its determination that the video evidence is inconclusive as to the cause of Blount's arm striking Sgt. Lyall. The video from the handheld camera is obscured by multiple officers, and the Rapid Eye footage skips past the precise moment when Blount's arm began to move. Although the images of Davis captured in the Rapid Eye footage provide some reason to believe that he did not push Blount's arm forward,[6] ultimately the court is convinced that the video evidence is not reliably supportive of either party. The same is true of the videos of the incidents involving inmates Canada and Tucker. Although the footage from the Canada incident provides a clear view of the officers and the inmate's arm, it is impossible to draw a reasonably firm conclusion as to the cause of Canada's arm movement. The video of the Tucker incident is also largely unhelpful simply because it is difficult to see the participants' actions. As such, the court finds that the video evidence does not greatly aid the plaintiff in proving that the defendants intended to create a situation whereby they could maliciously inflict pain on Blount.

As with the video evidence, the court believes that the remaining evidence adduced at trial fails to meet the plaintiff's burden of affirmatively proving a constitutional violation by a preponderance of the evidence. The whole of the evidence presented, while not entirely convincing one way or another, casts a reasonable doubt on the plaintiff's version of the events. First, the court finds credible the testimony of Officers Davis and Boyd in recounting that Blount

---

[6] Davis appears to lose his balance as Blount's arm moves, falling awkwardly forward as if he was caught unaware by the action.

8

moved his arm forward of his own volition. Although Boyd, positioned on Blount's right, candidly admitted that the only people who could be certain of the cause of the left arm movement are Blount and Davis, he testified that it appeared to him that Blount lunged forward without provocation. He stated that he felt Blount's whole body tense before the movement, indicating to him that Blount moved intentionally. Officer Davis also testified credibly that Blount moved his left arm intentionally. His description of the events was consistent with the testimony of the other officers as well as the video evidence. He testified that he had Blount's hand in a "wrist lock"—a technique used to maintain control of an inmate while his hands are otherwise unrestrained. He explained that it was Blount's sudden movement that caused him to lose his grip on the hand. The fact that Davis lost control of the hand immediately after the movement is an indication that the lunge forward was initiated by Blount and came as a surprise to Davis. Davis also testified that after he lost control of the hand he applied pressure to the back of Blount's arm and tried to maneuver it away from Sgt. Lyall, explaining the immediate fall forward.

The court also finds credible the officers' testimony regarding the steps taken to reestablish control once the struggle began. The officers were candid about their application of pressure on Blount's fingers as a means of enabling them to re-secure his hands. Although Blount suffered injuries, they were relatively mild and were consistent with what would be expected to occur during a scrum between multiple officers and a resisting inmate. And although the court finds that Blount was not overly combative with the officers once he was on the ground, he clearly resisted their efforts to re-secure his hands, and this led to the infliction of greater injuries.

The court also notes that the officers' demeanor throughout the incident casts doubt on the plaintiff's theory of the case. The court finds that the officers conducted themselves professionally and humanely in dealing with an inmate who had just sprayed an obnoxious and dangerous substance on their co-workers. Under Captain Tate's direction, the officers safely removed Blount from his cell and transferred him to the vestibule where he was placed in ambulatory restraints, a proper reaction to his offense. Although not physically resistant, Blount was verbally combative with the officers and appears to have been in a volatile state of mind. In contrast, the officers were restrained and professional, and appeared simply to be trying to perform their job in securing a disruptive inmate. The appearance of the assisting officers in the vestibule also belies the plaintiff's account of a premeditated, orchestrated assault. There were a half dozen other guards present while Blount was being restrained, and they appeared to be casually observing the procedure, ready to assist only if necessary. One of the officers was slouched against the wall. Although some of the officers eventually did assist Boyd and Davis in securing Blount after his arm strikes Sgt. Lyall, the demeanor and appearance of those present simply does not comport with a plan to wantonly inflict pain.

However, the court does note its belief that Blount has succeeded in raising some suspicion based on the comparison between the incident with Blount and those of Canada and Tucker. The facts surrounding all three incidents are remarkably similar to one another. Each begins with an inmate hurling feces at the guards; each involves the subsequent process of placing the inmate in ambulatory restraints; all three inmates are alleged to have shoved their arms forward into an officer at exactly the same step in the process; the injuries suffered by the inmates are similar; and, most importantly, all three incidents involve Davis holding the inmate's arm during the alleged movement. Davis testified that the only instances of which he was aware

of an inmate striking an officer during the application of ambulatory restraints were the three considered at trial. It is a very unusual coincidence that inmates would only attempt such a maneuver with Davis involved. Davis himself noted the strangeness of this fact and had no reasoned explanation for it. Based on the similarity of the incidents, it would not be unreasonable to conclude that Davis' involvement in all three is suspicious.

The court also notes its concern over the fact that none of the three incidents resulted in formal disciplinary action against the inmates. An initial charge was filed by Sgt. Lyall in Blount's case, but it was not pursued. All three incidents involved allegations of an inmate intentionally striking an officer, a serious offense, yet the acts ultimately went unpunished. Although there may be many perfectly benign explanations for this lack of diligence, one potential justification might be a desire to sweep the matter under the rug and avoid investigative scrutiny.

Altogether, in weighing the parties' conflicting accounts, the court believes the evidence in support of each to be in equipoise. Because the plaintiff carries the burden of proving each of the elements of his claim by a preponderance of the evidence, the court is compelled to rule in favor of the defendants. See United States v. Manigan, 592 F.3d 621, 631 (4th Cir. 2010) ("The burden of showing something by a preponderance of the evidence . . . requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence.") (quotation marks omitted); see also McNeal v. United States, 689 F.2d 1200, 1202 (4th Cir. 1982) (affirming a finding for the defendant where the evidence was in equipoise). Ultimately, the court finds the lack of clear video evidence of who initiated Blount's arm movement to be dispositive in the matter. This fact is critical to Blount's case, because without it the court cannot say that the officers' use of force was wanton and aimed at maliciously inflicting pain. The Whitley factors

examine, in part, the need for the application of force and the extent of the threat reasonably perceived by the officers. Whitley, 475 U.S. at 321. The need to tackle Blount and re-secure his hands through force, as well as the threat he posed to the officers, depends largely on who was responsible for the altercation in the first place. Without a determination that the defendants intentionally created the situation, it cannot be said that their response was anything more than "a good faith effort to maintain or restore discipline." Id. at 320. The videos, inconclusive at best, simply do not enable the court to conclude that it is more likely than not that Davis intentionally pushed Blount's arm into Sgt. Lyall. With the remaining testimonial accounts of the three incidents in sharp conflict, Blount has simply failed to prove by a preponderance of the evidence that the defendants used excessive force in violation of the Eighth Amendment.

## V.     Conclusion

For the reasons stated above, the court will enter judgment in favor of the defendants. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to the plaintiff and to all counsel of record.

**ENTER**: This _12th_ day of June, 2013.

_____
Chief United States District Judge